## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

| | | |
|---|---|---|
| ROBERT D. CURRIE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No.: 1:11-cv-892 |
| | ) | |
| BETH ARTHUR, SHERIFF, | ) | |
| | ) | |
| Defendant. | ) | |

### MEMORANDUM OPINION

This matter involves allegations that Plaintiff Robert D. Currie ("Currie") experienced unlawful racial discrimination and retaliation while employed by Sheriff Beth Arthur ("Arthur" or "Sheriff") of the Arlington County Sheriff's Office (the "Sheriff's Office"). Currie's complaint contains three causes of action against Arthur: (1) Title VII race discrimination, pled as hostile work environment and disparate treatment; (2) Title VII retaliation; and (3) violation of 42 U.S.C. § 1983.

This matter comes before the Court on Arthur's Motion for Summary Judgment (Dkt. No. 150). For the reasons that follow and good cause shown, it is hereby ORDERED that Defendant's Motion for Summary Judgment is GRANTED.

### BACKGROUND

The Plaintiff is an African-American male who worked as an Inmate Services Counselor for the Sheriff's Office. Currie began work at the Sheriff's Office on September 9, 2002. Sheriff's Office employees are evaluated in multiple categories on a scale from "needs improvement to meet standards," to "achieves standards," and "exceeds standards." Employees receive an overall rating and ratings in individual categories based upon the same metric. As

early as Currie's first performance review, in February 2003, his supervisor noted his difficulty

interacting with co-workers and supervisors. Though he achieved standards overall, he received a

needs improvement rating in the arena of interpersonal interaction and development.

Specifically, his supervisor noted his difficulty establishing a rapport with peers and tendency to

become defensive when discussing his work.

Currie progressed in 2004, receiving an achieves standards rating overall and achieving

or exceeding standards in every individual category. Nevertheless, concerns about his

interactions with others and defensive nature remained. *See* Def. Ex. 24 at 1 ("Mr. Currie could

improve in this area by accepting feedback from others without becoming defensive when

deficiencies are brought to his attention."). The next several years followed a similar pattern:

Currie achieved standards overall and at times exceeded standards in individual areas, but issues

surrounding his ability to interact with others and accept criticism remained. In 2006, two

internal memoranda reflect Currie's unwillingness to accept constructive criticism, work

effectively with a team, or trust his supervisors. By 2007, despite participation in a course on

interpersonal interaction, Currie again received a needs improvement rating in the area.

All three of the illustrations of an alleged racially hostile work environment occurred in a

five-month period in 2009. First, on April 25, 2009, the Plaintiff found a watermelon with a hole

in it on his work station. Though he initially denied it, Russell Edwards, an African-American

co-worker of the Plaintiff, admitted to placing the watermelon there. Two other African

American co-workers, Sergeant Lindsey and Deputy Coles, witnessed the incident and saw

nothing racial about one African-American leaving his watermelon on another African-

American's workstation.[1] Nor did Currie indicate he thought the incident was racially motivated in an internal memorandum filed two days thereafter. Currie reacted by asking the owner of the melon to remove it. Currie denies responding boisterously or inappropriately, but his co-workers remember the incident differently.[2] An internal investigation into the watermelon incident found Currie's complaint unfounded. Second, beginning on July 6, 2009, when the Plaintiff approached Deputy David Chambers' work station, he would say "[t]here goes the neighborhood." Compl. ¶ 16; Currie Dep. at 249. Plaintiff maintains Chambers, who is Caucasian, made such a statement four or five times over the period of a month and a half. Captain Callahan investigated the incident and no further comments were made. Third, Donald Guillen, a Latino colleague who worked as a supply assistant, addressed the Plaintiff as "boy" multiple times around July 20, 2009.[3] The Sheriff's Office investigated the incident and did not sustain the allegations.

Also on July 20, 2009, Plaintiff's then-counsel wrote Sheriff Arthur regarding the watermelon incident. His attorney asked the Sheriff to preserve any recording of the incident and noted that Currie denied overreacting to what he believed to be a racially motivated provocation. The same month, Plaintiff's supervisor Lashawn Fisher met with Currie after two incidents between Currie and co-workers. Fisher warned Currie of the perception that he is "very difficult to work with." Fisher Decl. ¶ 5.

---

[1] *See* Coles Decl. ¶ 7 ("Later, when I heard something about this being a racial incident, I was shocked. Mr. Russell is black and I do not understand how Mr. Currie could say there was anything racial about this."); Lindsey Decl. ¶ 8 ("There is nothing racial about Mr. Edwards eating a watermelon while he worked."); *see also* Williamson Decl. ¶ 5 ("Mr. Currie did not say anything about race during the incident. When I later heard this was supposed to be about race, I was stunned."). Edwards Decl. ¶ 8 ("The idea that there was something racial about my eating watermelon never occurred to me.").

[2] *See* Lindsey Decl. ¶¶ 5,8 (Currie's use of a "loud angry voice . . . was not appropriate . . . [and] not unusual."); Williamson Decl. ¶ 4 ("I thought Mr. Currie was out of line.").

[3] It is unclear exactly how many times Guillen used the term. Currie offered two contradictory accounts during his deposition. *See* Currie Dep. at 153 (noting Currie's written statement that Guillen referred to the Plaintiff as "'boy' several times" was an accurate statement when he made it). *But see id.* at 253 (stating Guillen referred to the Plaintiff as boy "numerous times" over a three month period). The Court assumes Guillen used the term "numerous times" for the purposes of this motion.

3

In August 2009, Currie's annual review noted a number of concerns. For the first time, he received an overall rating of needs improvement, along with a needs improvement grade in four individual categories. Again, his review cited his tendency to become defensive and a failure to treat co-workers with respect. Currie did not dispute the poor review at the time. He evinced his intent to improve, writing "Will be done. I am certain the needed adjustment will be made," on the review form itself. Def. Ex. 39 at 3.

As a result of his poor review, on August 17, 2009, Sheriff Arthur placed Currie on one year of probation. Currie maintains that the review and placement on probation were in retaliation to the letter sent by his counsel. The sole consequence of the probationary period was a change in Currie's review cycle. Instead of an annual performance appraisal, Currie would receive reviews quarterly until he received a rating of achieves standards or above in every individual category. *See* Tement Decl. ¶ 9 (explaining probation "is not a disciplinary measure, but is used to more closely monitor an employee's performance to correct behavior"). He received achieves standards or better in every category in April 2010, and returned to the annual review schedule.

On June 8, 2010, Currie received a letter of reprimand. The reprimand references five instances of inappropriate conduct between March and May 2010, in which Currie's conduct ranged from being rude to supervisors, disrespectful to co-workers, and involved in an inappropriate interaction with an inmate. In Currie's August 2010 annual review, he achieved standards overall but, again, received a needs improvement in the area of interpersonal interactions and development.

In 2011, two incidents led to an internal investigation and Currie's termination on July 28, 2011. In March 2011, several inmates in a housing unit filed a grievance against that unit's

deputy sheriff. An investigation found Currie learned of the investigation and improperly informed the deputy that there was an investigation concerning him. Further, the investigation found Currie required the inmates who authored the grievance to move to another cell block. Finally, during the course of the investigation, Sheriff Arthur found Currie made false statements to his chain of command. In sum, the investigation revealed Currie violated three Sheriff's Office policies during the course of the March incident. In June 2011, an altercation occurred while Currie interviewed an inmate. Though the inmate had been designated for administrative segregation, Currie interviewed him outside of his cell. A Sheriff's Office investigation found that Currie made inappropriate and unprofessional statements during the interview, which incited the inmate to attack him. This put Currie, another deputy, and the inmate's safety at risk. The Sheriff also determined Currie made false and misleading statements to his chain of command during the investigation. In total, the investigation found Currie violated two Sheriff's Office policies.

Sheriff Arthur terminated Currie on July 28, 2011 for these five violations of Sheriff's Office policy in the course the March and June 2011 incidents. Specifically, Arthur found Currie 1) made false statements in the March and June investigations; 2) failed to act professionally while interviewing the inmate; and 3) retaliated against inmates for filing a grievance.

Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on September 10, 2009 (the "First Charge"). The First Charge alleged racial discrimination and retaliation based upon the watermelon incident and Guillen's use of the word "boy." *See* Compl. Ex. C. It did not reference Chambers' statements. It alleged Arthur retaliated against the Plaintiff by means of a poor performance review and placement on

probation on August 17, 2009, just under a month after his attorney sent a letter to the Sheriff's Office requesting information regarding the watermelon incident.

Plaintiff also filed two additional charges of discrimination. On January 26, 2011, Plaintiff filed a second charge of discrimination (the "Second Charge") alleging race and sex discrimination, along with retaliation for filing the First Charge. Compl. Ex. E. Plaintiff maintains his July 28, 2011, termination occurred in retaliation to his First and Second Charges. On August 4, 2011, Plaintiff lodged another charge of discrimination (the "Third Charge"), claiming his race, sex, and age, combined with his prior EEOC complaints led to harassment, a hostile work environment, and his termination. *See* Compl. Ex. I.

The EEOC issued a Notice of Right to Sue for the First Charge on May 26, 2011—after Currie filed his Second Charge but before filing the Third Charge. Notices of Right to Sue for the Second and Third Charges have not yet issued.

## LEGAL STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). Entry of summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The non-moving party must go beyond the pleadings and mere allegations to "set forth specific facts showing that there is a genuine issue for trial." *Id.* at 323. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis

original). Indeed, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted).

## ANALYSIS

The Defendant is entitled to summary judgment on all three counts. The Court addresses each count, and its respective failings, in turn.

### A. Count I: Hostile Work Environment[4]

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . ." 42 U.S.C. § 2000e-2(a)(1). A Title VII claim for a racially hostile work environment requires the Plaintiff to show the harassment was (1) unwelcome; (2) based on race; (3) sufficiently severe or pervasive to alter the terms of employment and create an abusive atmosphere; and (4) that it was imputable on some factual basis to his employer. *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183-84 (4th Cir. 2001). Plaintiff's allegations are insufficient in several respects. To begin, Plaintiff's evidence that his harassment was based upon race or imputable to his employer is simply farfetched and unsustainable. Even if Currie could successfully allege the instances of harassment were based upon race and imputable to Sheriff Arthur, the allegations are insufficiently severe or pervasive to create a colorable claim under Title VII.

---

[4] The Complaint in this case also alleges disparate treatment in Count I. However, Plaintiff's opposition to Defendant's Motion for Summary Judgment fails to even mention disparate treatment. Though it appears to the Court that any such claim has been abandoned, to the extent it remains, it is insufficient as a matter of law. To establish a prima facie case of disparate treatment Currie must show (1) he is a member of a protected class, (2) he was qualified for his job and his performance was satisfactory, (3) in spite of his performance and qualifications, he was fired, and (4) that the position remained open to similarly qualified applicants after his dismissal. *Karpel v. Inova Health Sys. Servs.*, 134 F.3d 1222, 1227-28 (4th Cir. 1998). As explained *infra*, the Plaintiff cannot show his performance was satisfactory or that he was fired in spite of his performance. There is no evidence whatsoever that Currie was treated differently than similarly situated employees. Nor did his position remain open following his termination. *See* Larson Supp. Decl. ¶ 3 (noting Plaintiff's position was never filled, his duties were distributed to other Inmate Service Counselors). Furthermore, if Currie could make a prima facie showing, Arthur has put forth a legitimate non-discriminatory basis for his termination that Currie fails to rebut.

To establish alleged harassment was racially motivated, the Plaintiff must demonstrate that but for his race, he would have been treated differently. *See Gillian v. South Carolina Dep't of Juvenile Justice*, 474 F.3d 134, 142 (4th Cir. 2007). Though the use of "boy" can clearly constitute a racial insult, it is neither "always . . . evidence of racial animus" nor is it "always benign." *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 456 (2006); *see also White v. BFI Waste Servs., LLC*, 375 F.3d 288, 297 (4th Cir. 2004) (including the term "boy" among a list of terms indicative of a severe or pervasively hostile environment). Instead, courts look to the speaker's meaning, which "may depend on various factors including context, inflection, tone of voice, local custom, and historical usage." *Ash*, 546 U.S. at 456. When viewed in context, the Court has doubts as to whether any of the three instances of harassment occurred but for Currie's race.

First, with regard to the watermelon incident, it is uncontroverted that Russell Edwards, an African-American, owned the watermelon left on Plaintiff's workstation.[5] Even taking the facts of this case in the light most favorable to the Plaintiff, it is unlikely that any jury would find that a watermelon left by one African-American on the desk of another African-American was racially motivated. The two witnesses to the exchange—both African-American males—found the incident amusing and not racial in nature. *See* Coles Decl. ¶ 7 ("Later, when I heard about this being a racial incident, I was shocked."); Lindsey Decl. ¶ 8 ("There is nothing racial about Mr. Edwards eating a watermelon while he worked."); Edwards Decl. ¶ 8 ("The idea that there was something racial about my eating watermelon never occurred to me."). This is especially

---

[5] Plaintiff's attempt to create a genuine issue of material fact regarding the ownership of the watermelon is unavailing. Though Edwards initially denied ownership of the melon, he admitted it was his under oath, removed it at the request of his supervisor, and was identified as its owner by every single witness to the altercation. *See, e.g.*, Edwards Dep. at 52 ("[I]t was my watermelon."); Compl. ¶ 10 (noting Sergeant Williamson appeared "and indicated that the watermelon belonged to Russell (Edwards) . . . . [Williams] instruct[ed] Russell Edwards to remove the watermelon from plaintiff's work desk. Mr. Russell Edwards removed the watermelon from plaintiff's work desk."); Coles Decl. ¶ 6 ("It was Mr. Edwards [sic] watermelon and he had been eating it."); Lindsey Decl. ¶ 6 (stating he saw Edwards eating the watermelon while he worked). Notably, at no point did Currie (or any other individual) suggest the owner of the watermelon was anyone other than Edwards.

true when there is no objective evidence in the record that Edwards left the watermelon as a symbol of racial hostility. Indeed, it appears the watermelon was Edwards' lunch, which he left on Mr. Currie's workstation.[6]

Likewise, there is no evidence in the record that Deputy Chambers' comment, "there goes the neighborhood," was racially motivated.[7] The sole support provided by the Plaintiff for the notion that the statement was driven by racial animus is that Chambers is Caucasian while the Plaintiff is African-American. Such an allegation, without more, is insufficient to tinge Chambers' statement with racial hostility. "Law does not blindly ascribe to race all personal conflicts between individuals of different races. To do so would turn the workplace into a litigious cauldron of racial suspicion." *Hawkins v. PepsiCo., Inc.*, 203 F.3d 274, 282 (4th Cir. 2000). Instead, Currie must provide legally sufficient evidence to transform the ordinary exchange between Chambers and Currie into an actionable claim of discrimination. *Id.*

Finally, with regard to Guillen's use of the term "boy" when addressing the Plaintiff, several factors indicate he did not use the term as a derogatory reference to Currie or African-Americans. In fact, Guillen stated that he would "say hello to guys no matter if they are black or white or whatever, by saying something like 'what's up boy?'" Guillen Decl. ¶ 5. Plaintiff produced no evidence to the contrary. Furthermore, when Defendant confronted Guillen and asked him not to use the term, he apologized and never used "boy" with Plaintiff again. *Id.* ¶¶ 5-6; *see also* Currie Dep. at 255 (confirming Guillen apologized when confronted by Currie).

---

[6] Lindsey Decl. ¶ 6 ("I saw Mr. Edwards eating a watermelon while working on his computer. I had seen Mr. Edwards eat a small softball watermelon while he worked on a number of occasions before this."); Coles Decl. ¶ 6 ("It was Mr. Edwards [sic] watermelon and he had been eating it. I know that Mr. Edwards likes watermelon because since then I have seen him eating them often"); Edwards Decl. ¶ 5 ("I had a small watermelon that I was eating . . ."); *see also id.* ¶ 6 (noting the melon was "on/in" a plastic bag to prevent making a mess); Compl. Ex. B (photo showing the watermelon on top of a plastic bag).
[7] However, Defendant concedes the statement was racially motivated for the purpose of summary judgment. *See* Def. Mot. at 9, n.8.

9

When viewed in context, the Court does not find that any of the allegations, individually or in aggregate, were based upon the Plaintiff's race to the extent required to make even a prima facie showing under Title VII.

Nor is it clear that any impropriety could be imputed to Arthur. Employers "cannot be held to a standard under which they are liable for any and all inappropriate conduct of their employees." *Spicer v. Commonwealth of Va., Dep't of Corr.*, 66 F.3d 705, 711 (4th Cir. 1995) (en banc). "Where an employee has been harassed by a coworker, the employer may be liable in negligence [under the fourth element] if it knew or should have known about the harassment and failed to take effective action to stop it." *E.E.O.C. v. Xerxes Corp.*, 639 F.3d 658, 669 (4th Cir. 2011) (internal quotations omitted). In assessing the effectiveness of an employer's remedial action, the Fourth Circuit has "considered the promptness of the employer's investigation when the complaint was made, whether the offending employees were counseled or disciplined for their actions, and whether the employer's response was actually effective." *Id.* "[W]hen an employer's remedial response results in cessation of the complained of conduct, liability must cease as well." *Spicer*, 66 F.3d at 711.

All three of the incidents were investigated and resolved. No further incidents between the Plaintiff and those involved with the alleged harassment recurred. Following the watermelon incident, Sergeant Williamson asked Edwards to remove the watermelon from Plaintiff's work station; Edwards complied. Plaintiff makes no further accusations against Deputy Edwards, Sergeant Williamson, or any witness to the altercation, and no similar incident recurred. Following Currie's report that Deputy Chambers said "there goes the neighborhood," Chief Deputy Larson appointed Captain Callahan to investigate the matter. *See* Larson Decl. ¶ 10;

Callahan Decl. ¶¶ 4-5.[8] After allegedly making the statement four or five times over a month and

a half, the conduct stopped.[9] Similarly, when Currie complained about Guillen's use of the term

"boy," Sergeant Adams and Captain Ternent spoke with Guillen about Currie's complaint. After

Currie confronted Guillen, he "never used the word boy to him again." Guillen Decl. ¶ 6.

Although Currie disputes whether the investigations were prompt and comprehensive, he alleges

no further instances of a racially hostile work environment occurred after August 2009. Remedial

action that stops the alleged harassment is "adequate as a matter of law." *Xerxes Corp.*, 639 F.3d

at 670 (quoting *Knabe v. Boury Corp.*, 114 F.3d 407, 411-12 n.8 (3d Cir. 1997)). Consequently,

the Court must find that Currie's allegations against his co-workers, which were investigated and

halted, are insufficient to impute liability to Arthur.

Even if Currie's allegations could be considered racial in nature and imputable to Sheriff

Arthur, they are insufficiently severe or pervasive to alter the terms of Currie's employment. To

rise to the level of a Title VII violation, conduct must be both subjectively and objectively severe

or pervasive. *See, e.g., Xerxes Corp.*, 639 F.3d at 676. Proving conduct rises to the level of

objectively severe and pervasive is a tall order. To satisfy the "high bar" set by Title VII, [10]

Currie's workplace must be "permeated with discriminatory intimidation, ridicule and insult . . .

that is sufficiently severe or pervasive to alter the conditions of the victim's employment and

create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)

---

[8] Plaintiff's attempt to dispute whether an investigation into Chambers' statement occurred is unmoving. Currie's deposition testimony that to his knowledge no investigation occurred does not contradict declarations from Chief Deputy Larson and Captain Callahan. *See* Callahan Decl. ¶ 5 ("I interviewed Deputy Chambers about [Currie's allegations]. He denied that he said this to Mr. Currie."); Larson Decl. ¶ 10 ("[I] directed Captain Callahan to investigate the matter. After this Mr. Currie did not make any other complaint[s] about this and, whether the comments had been made before or not, apparently no further such comments were made.").

[9] *See* Currie Dep. at 249 (alleging the Chambers made the statement only four or five times over the course of a month and not thereafter); Larson Decl. ¶ 10 (stating that after directing Captain Chambers to investigate, "Currie did not make any other complaint about this and . . . apparently no further such comments were made.").

[10] *E.E.O.C. v. Cent. Wholesalers, Inc.*, 573 F.3d 167, 176 (4th Cir. 2009) ("[W]e have recognized that plaintiffs must clear a high bar in order to satisfy the severe or pervasive test . . . .") (internal quotations omitted).

(internal citations and quotations omitted). "Relevant considerations 'may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Spriggs*, 242 F.3d at 184 (quoting *Harris*, 510 U.S. at 23).

Far from permeating Currie's work environment with racial animus, the three examples of allegedly racially insensitive behavior were neither severe nor pervasive. At the outset, it is worth noting the conduct occurred at the hands of three different employees—none of whom supervised Currie—over the course of five months during Currie's nearly nine-year employment with the Sheriff's Office. Additionally, there is no objective evidence that Russell—an African-American—intended to racially ridicule or otherwise discriminate against Currie when he left his watermelon on Plaintiff's workstation.[11] To the contrary, even Currie, writing in an Inter-Departmental Memorandum describing the incident two days thereafter, did not mention race or in any way suggest the incident was racial in nature. *See* Def. Ex. 11; *see also* Williamson Decl. ¶ 5 ("Currie did not say anything about race during the incident."). Every witness to the interaction, including two African-Americans, agreed there was nothing racial about the incident. Indeed, Deputy Coles was "shocked" to hear Currie thought the incident was racial. Coles Decl. ¶ 7. In such a circumstance, no reasonable jury could find the watermelon incident sufficiently severe to alter the terms and conditions of Currie's employment. Moreover, it is undisputed that

---

[11] In *Ross v. Douglas Cnty., Nebraska*, the Eighth Circuit found that "a black male could discriminate against another black male . . . ." 234 F.3d 391, 396 (8th Cir. 2000); *see also Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79 (1998) (finding nothing in Title VII necessarily bars a claim when the plaintiff and defendant are of the same sex). Even assuming, without deciding, that in the proper case discrimination between members of the same race could rise to the level of a Title VII violation, this is not that case. In *Ross*, the alleged discriminatory conduct was unambiguous—a co-worker "constantly" referred to him as "nigger" and "black boy"—terms that are unmistakably racial and reprehensible in any context. *Id.* at 396-97. By contrast, there was nothing overtly racial about Edwards' conduct. In fact, *every* witness to the altercation—including two African-Americans—saw nothing racial about the incident. One employee simply left his lunch on another employee's desk.

the incident was isolated. No further incidents involving a watermelon or between any of the Sheriff's Office employees who witnessed or took part in the incident recurred.

The next alleged instance of racial harassment occurred just over two months later. Beginning on July 6, 2009, when Currie approached Deputy Chambers' workstation, he would say "there goes the neighborhood." Compl. ¶ 16; Currie Dep. at 249. Plaintiff maintains Chambers made such a statement four or five times over the period of a month and a half. "However, there is no evidence that [Chambers'] actions, even if they occurred, were motivated by [Currie]'s race . . . ." *Xerxes Corp.*, 639 F.3d at 677 (citing *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 281 (4th Cir. 2000) (concluding that disputes with a supervisor, without evidence that harassment was racial in nature, were not enough to sustain summary judgment on a hostile work environment claim).[12] As was discussed previously, the mere fact that Chambers is Caucasian while Currie is African-American is insufficient to attribute any conflict between the two to race. *See Hawkins*, 203 F.3d at 281 ("Law does not blindly ascribe to race all personal conflicts between individuals of different races."). The same is true for Guillen's use of the term "boy;" there is simply no evidence to support the argument that Guillen used the term in a derogatory sense. *See* Guillen Decl. ¶¶ 5-6 (stating he greeted everyone, no matter their race, by saying "what's up boy?" and apologized and stopped using the term upon Currie's request).

Were the Court to construe "there goes the neighborhood" and "boy" as racial slurs, their use would remain insufficient to bring Currie within Title VII's purview. In the context of racial slurs, "there must be more than a few isolated incidents of racial enmity, meaning that instead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments. Thus, whether racial slurs constitute a hostile work environment typically depends upon the quantity,

---

[12] It is also notable that Currie did not mention the incident in any of his three EEOC Charges. *See* Compl. Exs. C, E & I.

frequency, and severity of those slurs, considered cumulatively in order to obtain a realistic view of the work environment." *Schwapp v. Town of Avon*, 118 F.3d 106, 110-11 (2d Cir. 1997) (internal citations and quotations omitted); *see also Patterson v. Cnty. of Fairfax*, 215 F.3d 1320, 2000 WL 655984, at *4 (4th Cir. 2000) (unpublished) (quoting *Bolden v. PRC, Inc.*, 43 F.3d 545, 541 (10th Cir. 1994) ("Instead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments.")).

Courts attempt to distinguish colorable allegations of pervasive and general use of racial slurs with isolated instances that, although reprehensible, do not rise to the level of severity necessary to alter the conditions of an employee's work environment. *Compare Spriggs*, 242 F.3d at 182, *and White*, 375 F.3d at 297, *with Skipper v. Giant Food Inc.*, 68 F. App'x 393, 398 (4th Cir. 2003), *and Perry v. Harvey*, 332 Fed. App'x 728, 732 (3d Cir. 2009) (unpublished) (upholding the district court's determination that a superior's use of the term boy was not severe and noting that even accepting the plaintiff's requested inference that boy is racially motivated, "it does not rise above an offhand comment or sporadic abusive language," and is insufficient to give rise to a Title VII claim) (internal quotations and citations omitted). In the context of this dichotomy, allegations that Guillen referred to Currie as "boy" over a three month period, Chambers said "there goes the neighborhood" four or five times over a month and a half, and Edwards left his watermelon at Plaintiff's workstation are wholly insufficient to permeate Currie's work environment "with discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris*, 510 U.S. at 21 (internal citations and quotations omitted). Summary Judgment is therefore granted as to Count I.

## B. Count II: Retaliation

Title VII forbids retaliation by employers against employees who report racial

discrimination in the workplace. 42 U.S.C. § 2000e, *et seq.*; *Crawford v. Metro. Gov't of*

*Nashville and Davison Cnty.*, 555 U.S. 271, 273 (2009). To prove a prima facie case of

retaliation, a plaintiff must demonstrate (1) he engaged in a protected activity; (2) that an adverse

employment action was taken against him; and (3) that there was a causal link between the

protected activity and the adverse employment action. *Laughlin v. Metro. Wash. Airports Auth.*,

149 F.3d 253, 258 (4th Cir. 1998). If the Plaintiff puts forth a prima facie case of retaliation, the

burden then shifts to the defendant to "rebut the presumption of retaliation by articulating a non-

retaliatory reason for its action." *Id.* If the defendant's rebuttal is successful, the presumption of

discrimination "drops from the case" and the Plaintiff bears the ultimate burden of proving he

was the victim of retaliation. *Id.*

Plaintiff points to two adverse employment actions. First, he maintains his August 2009

performance evaluation and placement on probation occurred in retaliation to a letter from his

counsel regarding the watermelon incident. Second, Plaintiff argues his termination within six

months of filing the Second Charge also constituted retaliation.

### i. Currie's Claims that Arthur Retaliated by Means of a Poor Performance Evaluation and Placement on Probation Fail as a Matter of Law

Plaintiff maintains that he received a poor performance evaluation and a year of

probation less than thirty days following the Sheriff's receipt of a letter from his attorney, Victor

Glasberg. Such a claim fails to constitute retaliation for three reasons. First, the letter from

Plaintiff's attorney does not constitute a protected activity. Second, placement on probation does

not equate to an adverse employment action. Finally, should Plaintiff state a prima facie case, he cannot rebut the non-retaliatory basis for the Defendant's action.

The Fourth Circuit begins its analysis of what constitutes a protected activity with the words of the statute, which reference "oppos[ition] to any practice" or "particpat[ion] in any manner in an investigation, proceeding, or hearing." 42 U.S.C. § 2000e-3(a); *Kubicko v. Ogden Logistics Servs.*, 181 F.3d 544, 551 (4th Cir. 1999). It is uncontested that Currie did not participate in any protected activity prior to filing the First Charge in September 2009. Currie instead maintains a letter from his attorney constitutes opposition activity. "Opposition activity encompasses utilizing informal grievance procedures as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities." *Laughlin*, 149 F.3d at 259. "Whether an employee has engaged in protected opposition activity, turns upon balancing 'the purpose of the Act to protect persons engaging reasonably in activities opposing . . . discrimination, against Congress' equally manifest desire not to tie the hands of employers in the objective selection and control of personnel.'" *Kubicko*, 181 F.3d at 551 (quoting *Laughlin*, 149 F.3d at 259 (internal quotation marks omitted) (ellipses in original)). Plaintiff's attempt to fit the letter from his attorney into the rubric of opposition activity is questionable.

It is clear that a letter from an attorney "explaining" the defendant violated Title VII constitutes a protected activity. *Andrews v. Va. Union Univ.*, No. 3:07cv447, 2008 WL 2096964, at *9 (E.D. Va. May 16, 2008); *see also Singletary v. Distr. of Columbia*, 351 F.3d 519, 524-25 (D.C. Cir. 2003) (finding a letter from plaintiff's attorney requesting reconsideration of the Plaintiff's administrative appeal, including a detailed account of the Defendant's failure to comply with an administrative order and reference to the plaintiff's "ongoing pursuit of his

discrimination claims" sufficient to constitute opposition activity). However, not every letter from an attorney to the eventual defendant in a Title VII action amounts to a protected activity. In *Mikell v. Marriott Int'l, Inc.*, a letter from plaintiff's attorney, which noted the plaintiff "would like to return to work without taking further action to address what he believes may be illegal discrimination in the work place" was *not* a protected activity. 789 F. Supp. 2d 607, 619 (E.D. Pa. 2011). The court found that although the employer's action is described and the word discrimination is used, it was unclear what action the plaintiff found discriminatory, there is no mention of a protected class, and no allegation of race-based discrimination, so it did not constitute opposition in the eyes of Title VII. *Id.*

Here, the letter from Plaintiff's attorney referenced the watermelon "incident," during which Currie was "accused of having overreacted to an inappropriate racially motivated provocation." Def. Ex. 46. The letter denied "any such overreaction" and goes on to ask for any video or audio tape or its "secure maintenance as possible evidence." *Id.* Though the incident was labeled "inappropriate" and "racially motivated," there was no mention of Title VII, a protected class, or any pending action. *Id.* The word discrimination was not used and, most importantly, counsel did not accuse the Sheriff of any wrongdoing. Arguably, the purpose of the letter was to *defend* Currie ("He denies such an overreaction") and secure evidence for such a defense, not to assert any claim, let alone a claim for racial discrimination. Thus, it is questionable whether Currie can fulfill even this prerequisite.

Currie's prima facie case is plagued by another deficiency. It is doubtful that placement on probation and an unfavorable performance review constitute an adverse employment action. "An adverse employment action is a discriminatory act which adversely affects the terms, conditions, or benefits of the plaintiff's employment." *James v. Booz-Allen & Hamilton, Inc.*,

368 F.3d 371, 375 (4th Cir. 2004) (internal quotations omitted). "A tangible employment action

constitutes a significant change in employment status, such as hiring, firing, failing to promote,

reassignment with significantly different responsibilities or a decision causing a significant

change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998). In *Cornelius v.

City of Columbia*, the Plaintiff's complaints regarding an evaluation, a brief period of probation,

and allegedly unwarranted criticism, did not constitute an adverse employment action. 663 F.

Supp. 2d 471, 477 (D.S.C. 2009); *see also James*, 368 F.3d at 377 (noting a downgrade in a

performance evaluation could affect a term, condition, or benefit of employment, but only if the

employer subsequently used the action to detrimentally alter the terms and conditions of the

plaintiff's employment).

There is no evidence that Plaintiff's review detrimentally altered the terms and conditions

of his employment. It required solely that Currie would be reviewed quarterly instead of annually

until his ratings improved. By April 2010, just six months after the review in question, Currie

received a satisfactory rating in all categories, the probationary period ended, and his review

schedule reverted to the normal annual schedule. In the months and years that followed, Currie

does not so much as allege Arthur used the review or probationary period to alter the terms and

conditions of Currie's employment. Currie's responsibilities remained the same until his

termination. And, tellingly, Arthur made no mention of the 2009 review when terminating the

Plaintiff in July 2011.

Finally, and dispositive of this claim, should Plaintiff state a prima facie case for

retaliation, the Defendant stated legitimate nondiscriminatory reasons for her actions. Currie's

review includes detailed examples of areas of performance Currie needed to improve.[13]

Moreover, the record is replete with contemporaneous documentation and sworn testimony from co-workers buttressing the claimed insufficiencies in Currie's performance review.[14] The record also indicates that concerns about Currie's defensive responses to superiors and inability to work with coworkers were not an aberration. Similar issues were noted in Currie's first performance review, years before any alleged discrimination occurred. Additional concerns were also voiced in Currie's 2004, 2006, and 2007 reviews. Currie does not and cannot rebut the concerns of his supervisors and co-workers. In fact, Currie admitted his improprieties and vowed improvement. At the bottom of the 2009 performance review in question, he wrote: "Will be done. I am certain the needed adjustments will be made." Def. Ex. 39 at 3-4.[15] The Plaintiff cannot now attack his superiors' critiques when, at the time, he admitted he needed to improve and expressly indicated the criticism was well taken. Thus, it is clear that Currie was placed on probation and received a negative performance review for a legitimate nondiscriminatory purpose: aspects of his performance required modification, and his supervisors encouraged him to make necessary changes.

---

[13] It is also worth noting that his reviews were balanced assessments. While Currie is rated needs improvement in four categories, he met standards in six categories, and exceeded standards in another. In other words, the review was by no means a wholesale indictment of Currie's conduct. It was a specific critique of individual areas that required improvement.

[14] *See, e.g.*, Lindsey Decl. ¶¶ 5, 8 (referring to Currie's inappropriate behavior within the period in question and explaining "[i]t was not unusual for Mr. Currie to get angry and loud."); Williamson Decl. ¶ 4 ("I thought Mr. Currie was out of line" when he "used an aggressive tone of voice" and "bull[ied]" a co-worker); Karl Decl. ¶ 6 (when attempting to speak with Currie about improving his behavior, he "got loud and accused Ms. Fisher and me of being poor managers"); Fisher Decl. ¶ 4 (Currie "got loud and accused Ms. Karl and me of being poor managers"); *id.* Decl. ¶ 5 (describing a July 2009 conflict between Currie and co-workers, which required switching Currie's shift to "minimize conflicts"); Karl Decl. ¶ 8 (noting she met with Currie in July 2009 after a report that he was critical of jail programs in front of inmates and volunteers).

      His employee record form, a document kept in the ordinary course of business, *see* Larson Decl. ¶ 8, also includes several notations from early July 2009, *before* the Sheriff received the letter. For instance, the form references the "perception within the Sheriff's Office that [Currie] is difficult to work with;" when asked to discuss such an accusation, "Mr. Currie became loud, speaking over both [supervisors] . . . and stating that he doesn't believe that others perceive him as difficult to work with. He demanded names . . . ." Def. Ex. 35 at 2.

[15] Plaintiff did, however, take exception to the review weeks later on September 9, 2009, the same day he filed his First EEOC Charge.

ii.   **The Court Lacks Subject Matter Jurisdiction to Address Plaintiff's Subsequent Retaliation Claim; Were the Court to Obtain Jurisdiction, the Claim Would Still Fail**

Plaintiff also alleges Arthur terminated him in retaliation for filing his EEOC charges.[16] It is uncontested that filing an EEOC charge is a protected activity, and termination is an adverse action. Nonetheless, the Court finds the second retaliation claim fails as a matter of law. The Court lacks subject matter jurisdiction to adjudicate the claim. Were the Court to reach the merits of the claim it would still fail because Currie cannot make a prima facie showing of retaliation or rebut Defendant's nondiscriminatory basis for his termination.

If the Plaintiff intends to assert he was terminated in retaliation for filing his First Charge, the Court lacks subject matter jurisdiction to adjudicate his claim. Under *Nealon v. Stone*, the Fourth Circuit held a Title VII lawsuit may extend to "any kind of discrimination like or related to the allegations contained in the charge and growing out of such allegations *during the pendency of the case before the Commission*." 958 F.2d 584, 590 (4th Cir. 1992) (emphasis added). The Fourth Circuit amplified this holding in a later, unreported case.

> *Nealon's* 'relation back' rule presupposes both that a retaliation count in a Title VII lawsuit be 'related to' and have 'grown out' of the EEO charge while the administrative charge is pending. If either predicate is lacking, the rule cannot operate to overcome a plaintiff's failure to have exhausted his administrative remedies.

*Brown v. Runyon*, 139 F.3d 888, 1998 WL 85414, at *3 (4th Cir. Feb. 27, 1998) (unpublished).

In *Brown*, the plaintiff filed an EEO sexual harassment charge against one of her supervisors in 1990. In 1991, her employer decided not to re-hire her and she sued for illegal retaliation to her 1990 charge. The plaintiff again requested reinstatement in 1993, but failed to

---

[16] It is unclear to the Court whether Currie intends to argue his termination occurred in retaliation for his First Charge, Second Charge, or a combination of the two. Plaintiff argues his termination occurred less than six months from the Second Charge, but the Complaint mentions neither charge within the retaliation cause of action of his Complaint. *Compare* Def. Opp'n at 6 *with* Compl. ¶ 53. Regardless of its construction, Currie's retaliation claim fails.

20

Case 1:11-cv-00892-LO -IDD Document 191 Filed 04/18/12 Page 21 of 25 PageID# 1883

initiate contact with an EEO counselor within forty-five days, as required by statute. The plaintiff argued the retaliation she suffered in 1993 grew out of the 1990 charge. The district court found otherwise and the Fourth Circuit affirmed. The Fourth Circuit found the 1993 retaliation claim barred because the 1990 charge "was not pending in 1993 when the plaintiff claims the employer retaliated against her." *Id.* at \*4.

Though Currie's claim that his termination constituted retaliation may relate back to his initial charge, it did not grow out his initial charge's allegations "during the pendency of the case before the Commission." *Nealon*, 958 F.2d at 590. Plaintiff filed his First Charge on September 10, 2009 and received his notice of right to sue on May 26, 2011. Sheriff Arthur terminated Currie on July 28, 2011. Consequently, the Court lacks subject matter jurisdiction to hear a claim that Arthur terminated him in retaliation for filing his First Charge. Similarly, if Currie maintains Arthur terminated him in retaliation for his Second Charge, the Court would still lack subject matter jurisdiction to adjudicate his claim. The Court lacks subject matter jurisdiction until his subsequent administrative complaint concludes, and a notice of right to sue issues. *See, e.g.*, *Jones v. Calvert Group, Ltd.*, 551 F.3d 297, 300 (4th Cir. 2009) ("[F]ailure by the plaintiff to exhaust administrative remedies concerning a Title VII claim deprives the federal courts of subject matter jurisdiction over the claim.").

Even if the Court had subject matter jurisdiction to adjudicate Plaintiff's claim, it fails as a matter of law. At the outset, Plaintiff fails to state a prima facie claim. Plaintiff's allegation that the Sheriff's Office terminated him six months after his Second Charge is insufficient to show even prima facie causation. "The cases that accept mere temporal proximity between an employer's knowledge of the protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity

21

must be very close." *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (per curiam) (quotations omitted) (citing cases where three and four months temporal proximity were insufficient to establish prima facie causation); *see also Wang v. Metro. Life Ins. Co.*, 334 F. Supp. 2d 853, 869-870 (D. Md. 2004) (holding that where the plaintiff made numerous formal and informal complaints but was never disciplined, termination less than one month after an informal complaint was insufficient to establish causation). The court's reasoning in *Wang* is instructive here. In *Wang*, the plaintiff filed a complaint alleging racial discrimination with the defendant's human resources department in March 2001. She complained about the same conduct in April 2002. She then argued she had sufficiently asserted prima facie causation because her termination occurred one month after her second, April 2002, complaint. The Court disagreed. It reasoned

> Plaintiff made numerous informal complaints about [her supervisor]. Moreover, she made a formal complaint alleging discrimination more than a year prior to her termination. There is no evidence before this Court that [the defendant] ever disciplined or retaliated against Plaintiff in any way for those complaints. There is no authority to suggest that the temporal proximity is sufficient under these facts.

*Id.* at 870. Like the Plaintiff in *Wang*, Currie instituted his First EEOC Charge in September 2009. Despite his myriad allegations, Currie does not argue Arthur ever retaliated against him for the First Charge alone. Rather, Currie maintains Arthur waited until six months after the Second Charge—filed nearly two years after the First Charge—to retaliate for either charge. Under these facts, the six month proximity between the Second Charge and Plaintiff's termination is legally insufficient to establish causation.

Finally, even if Plaintiff could put forth a prima facie case, Defendant provides ample support for its non-discriminatory basis for terminating the Plaintiff. Namely, in two incidents in March and June 2011, the Sheriff found Currie violated numerous internal policies, including

22

lying to investigators about both incidents. The Court finds nothing unusual about either investigation. Both incidents were thoroughly investigated by the Sheriff's Office: witnesses were interviewed and Currie received opportunities to respond to the allegations against him.

Following the March 2011 incident, Captain Ternent, Captain Callahan, and other Sheriff's Office officials conducted an investigation. They interviewed Currie, inmates Thompson and Waldron, and Deputies Fuentes and Israel. After the June 2011 incident, Captain Callahan interviewed Deputy Perez and Inmate Smith, and he also reviewed a memorandum submitted by Currie. Short of alleging a massive conspiracy against him, Currie does little to rebut the findings of the investigations. The Court finds Currie's conspiracy allegations woefully unsupported. Notably, of the employees implicated by Currie's previous retaliation or hostile work environment claims, none were involved in the incidents that led to his termination.[17] Those witnesses to the events of March and June 2011 who provided declarations or deposition testimony in this cause of action remained consistent to their previous accounts. Moreover, not a single witness questioned the findings or motivation of the investigators.

When Sheriff Arthur provided yet another opportunity for Currie to rebut the results of the investigations against him, his only response was that people lied about him. As a result, Sheriff Arthur terminated Currie for: (1) making false statements in two separate investigations, (2) failing to act professionally with an inmate, and (3) retaliating against inmates after learning about a grievance they filed against another deputy. In the face of an un-rebutted nondiscriminatory basis for Currie's termination, the Court will not and cannot disturb an employment decision by Sheriff Arthur made to ensure the integrity of her employees and the safety of her workplace.

---

[17] However, there was overlap in the supervisors charged with investigating the alleged incidents of racial hostility and those incidents that lead to Currie's termination. Captain Ternent was one of the employed charged with investigating the "boy" incidents, while Captain Callahan investigated Deputy Chambers' statements.

## C. Count III: Violation of 42 U.S.C. § 1983

It appears from the complaint that Plaintiff alleges a claim under 42 U.S.C. § 1983

against the Sheriff in her official capacity for violation of his Constitutional rights. *See* Compl. ¶

62 ("Unlike Caucasian employees . . . Plaintiff was deprived of constitutional rights . . . .").[18] At

no point, however, is it stated what provision of the Constitution the Sheriff violated, i.e., an

Equal Protection claim due to Plaintiff's protected status or a First Amendment retaliation claim.

Whatever the claim, for the reasons stated in the analysis of Plaintiff's hostile work environment,

disparate impact, and retaliation claims, the Court finds no wrongdoing and therefore no liability

under Section 1983. *See Beardsley v. Webb*, 30 F.3d 524, 529 (4th Cir. 1994) (courts may apply

the standards developed in Title VII litigation to similar claims under Section 1983).

In general, a claim under Section 1983 requires the Plaintiff to establish the following

elements: (1) the defendant acted under color of state law, (2) by those actions, the defendant

intentionally deprived the plaintiff of a right protected under the Constitution or laws of the

United States, and (3) the defendant's actions were the proximate cause of the deprivation. *Parks*

*v. Wilson*, 872 F. Supp. 1467, 1469 (D.S.C. 1995); 42 U.S.C. § 1983. Far from the evidence of

intentional discrimination required by Section 1983, Plaintiff has failed to allege sufficient

evidence of any discrimination. Indeed, in his responsive brief, the Plaintiff does not address the

merits of his Section 1983 claim at all. Rather, he attempts to rebut the Defendant's arguments

regarding Eleventh Amendment immunity by giving up any claim for damages against the

Sheriff in her official capacity, but attempting to maintain his request for injunctive relief.

This Court need not get as far as immunity. Immunity would come into play if the

Plaintiff successfully alleged facts to set forth a valid claim for deprivation of a right. *Williams v.*

---

[18] Plaintiff drafted the complaint *pro se*, before securing the assistance of counsel. However, Plaintiff's counsel entered his appearance nearly six months ago, and has represented the Plaintiff through numerous discovery disputes and this motion.

*Hansen*, 326 F.3d 569, 574 (4th Cir. 2003) (addressing qualified as opposed to Eleventh Amendment immunity). Then, the Court would address whether Eleventh Amendment immunity[19] acts as a bar to recovery. Without facts that set forth a valid claim for deprivation, the Court need not get that far, and summary judgment on Plaintiff's Section 1983 claim is granted.

## CONCLUSION

For the aforementioned reasons, Defendant's Motion for Summary Judgment is GRANTED. This constitutes the final appealable order of this case.


April 18, 2012
Alexandria, Virginia


/s/
Liam O'Grady
United States District Judge

---

[19] If sued in her official capacity, Eleventh Amendment Immunity would bar any request for damages against the Sheriff, who is acting as an agent of the state. *See Cromer v. Brown*, 88 F.3d 1315, 1332 (4th Cir. 1996).